RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0239p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

REBECCA JEAN SHIMEL,

　　　　　　　*Petitioner-Appellant,*

　　　*v.*

MILLICENT WARREN, Warden,

　　　　　　　*Respondent-Appellee.*

No. 15-2419

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 1:14-cv-14882—Thomas L. Ludington, District Judge.

Argued: July 26, 2016

Decided and Filed: September 22, 2016

Before: SILER, GIBBONS, KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** James S. Brady, DYKEMA GOSSETT PLLC, Grand Rapids, Michigan, for Appellant. Laura Graves Moody, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** James S. Brady, Alison L. Carruthers, DYKEMA GOSSETT PLLC, Grand Rapids, Michigan, for Appellant. Andrea M. Christensen-Brown, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

_____

## OPINION

_____

JULIA SMITH GIBBONS, Circuit Judge. Rebecca Shimel was convicted of second-degree murder and possession of a firearm in the commission of a felony pursuant to a plea deal in the shooting death of her husband. After sentencing, the Michigan trial court conducted an

evidentiary hearing under *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973). The court concluded that Shimel's trial counsel was ineffective for failing to investigate a battered spouse self-defense theory and granted her motion to withdraw her guilty plea. The Michigan Court of Appeals, however, reversed. It concluded that the trial court clearly erred in impermissibly substituting its judgment for that of trial counsel on a matter of strategy. On collateral review, the district court denied Shimel's claims that trial counsel was ineffective for failing to spend sufficient time consulting with her and for advising her to plead guilty rather than taking the case to trial and presenting a battered spouse self-defense theory. Shimel is unable to establish prejudice. Therefore, we affirm.

I.

The facts as recited by the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1).[1] *Wagner v. Smith*, 581 F.3d 410, 413. According to the Michigan Court of Appeals:

> Defendant was charged with open murder, MCL 750.316, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, in the shooting death of her husband, Rodney Shimel. Defendant fired seven shots, reloaded the gun, and continued to fire. Shimel sustained nine gunshot wounds, seven of which entered his body through his back. Defendant was arrested on the same day that the shooting occurred.
>
> Defendant was represented by four different attorneys, two court-appointed and two retained, before she entered her guilty plea. The court-appointed attorneys represented defendant only briefly. Before defendant's preliminary examination, while she was represented by her first retained attorney, the assistant prosecutor, J. Dee Brooks, offered to allow defendant to plead guilty to second-degree murder and felony-firearm with no sentence recommendation in exchange for the dismissal of the open murder charge. The offer remained open until the day before the preliminary examination. Although defendant decided to accept the plea offer, Brooks withdrew it because defendant's attorney did not inform him that defendant wanted to accept it until the morning of the preliminary examination. Thus, because the plea offer was not accepted before Brooks's deadline, the offer was withdrawn. Following the preliminary examination, defendant was bound over for trial.

---

[1]Shimel's argument that deference is owed to the state trial court's version of the facts, rather than the court of appeal's factual findings and legal conclusions, is without merit. *See infra* Section II.B.

Thereafter, the trial court granted defense counsel's motion to withdraw, and defendant retained attorney E. Brady Denton to represent her. On October 5, 2010, the trial court entered a stipulation to adjourn trial that indicated that Denton was investigating a "battered spouse" defense and intended to hire an expert to interview defendant. Denton spoke several times with attorney Dale Grayson at the National Clearinghouse for the Defense of Battered Women. Grayson sent Denton a packet of materials regarding the defense, including articles, appellate decisions in cases involving the defense, and information regarding courts' positions on the defense. According to Denton, he discussed the possibility of a battered spouse defense with defendant and her family and friends as well as the prosecutor. Ultimately, he decided not to pursue a battered spouse defense and did not hire an expert.

Over the next few months, Denton and Brooks had several discussions regarding a possible guilty plea. Brooks refused to consider a plea to manslaughter and refused Denton's request for a second-degree murder plea with a sentence cap. In January 2011, Brooks offered defendant the same plea that he had previously offered, i.e., second-degree murder and felony-firearm with no sentence recommendation in exchange for dropping the open murder charge. Defendant accepted the plea and pleaded guilty on February 3, 2011. The trial court sentenced defendant to 18 to 36 years in prison for the murder conviction, to be served consecutive to 2 years' imprisonment for the felony-firearm conviction.

On September 21, 2011, defendant filed a motion to withdraw her plea, to correct her invalid sentence, and to amend the presentence investigation report. In her motion to withdraw her plea, defendant argued that Denton had rendered ineffective assistance of counsel for failing to investigate a battered spouse syndrome defense and/or hire an expert to examine defendant. Defendant asserted that her plea was therefore involuntary. She requested the appointment of a battered spouse syndrome expert at public expense as well as a *Ginther*[2] hearing.

At the *Ginther* hearing, Denton admitted that he signed the stipulation to adjourn trial in part to investigate a battered spouse syndrome defense. He obtained the packet of materials from Grayson regarding the defense, talked to defendant, and reviewed the police reports. He asserted that he originally intended to hire an expert witness regarding the defense, but ultimately determined after reviewing the case materials that the defense was not worth pursuing. One of Denton's biggest concerns was the fact that defendant reloaded her gun and continued shooting. Also, there was not much evidentiary support to show a history of physical abuse against defendant. There was only one documented incident of domestic violence. When asked whether he thought that self-defense or a battered

---

[2]*People v. Ginther*, 390 Mich. 436; 212 N.W.2d 922 (1973) (footnote in original).

spouse defense was a viable defense, Denton responded, "I don't think it could be sold to a jury."

Denton testified that he met with defendant while she was incarcerated at least two or three times and probably wrote letters to her during the seven months that he represented her. Denton scored defendant's sentencing guidelines before the plea hearing but he did not tell defendant the sentence that she was likely to receive. Denton admitted that he told Grayson in a letter dated March 10, 2011, that defendant could receive "as little as 8 years, although [he] would expect 10 to 11 years" based on his calculation of the sentencing guidelines. Denton told defendant that her sentence would be controlled by the sentencing guidelines. Denton testified that one of his concerns was defendant's desire to be with her children. Defendant had told Denton that she wanted an opportunity to get out of prison and be with her children someday. Denton testified that considering defendant's desire to be with her children and his belief that a battered spouse defense would not be successful, he thought the second-degree murder plea was a good option because it would give defendant a chance to be released from prison one day.

Dr. Karla Fischer testified as an expert witness on domestic violence and battered spouse syndrome. She maintained that battered spouse syndrome is "not a defense per se, but the expert testimony helps to support a theory of self-defense." She opined that a battered spouse defense presented to a jury typically results in a reduction of charges, most commonly from first-degree murder to second-degree murder.

Fischer conducted a domestic violence evaluation of defendant in prison in October 2011 after defendant moved to withdraw her plea. Defendant told Fischer that Shimel [her husband] had abused her physically and emotionally throughout their 30-year marriage and had threatened to kill her. Defendant claimed that Shimel had punched her, strangled her, kicked her, restrained her, and committed acts of sexual violence against her. Defendant admitt[ed] stabbing Shimel with a knife while he was choking her early in their relationship. Fischer opined that, based solely on the information that defendant provided, defendant had acted in self-defense. Fischer admitted that she did not have a "full grasp" of the forensic evidence and that a battered spouse assessment is based on a defendant's perception of events, which might not match up with other facts. Defendant told Fischer that she was having financial difficulties at the time of the shooting, but Fischer did not believe that that information was important. When asked whether it would have had any significance if defendant had a gambling problem and defendant and Shimel had conflict about it, Fischer responded:

> *A.* Well, my job in understanding the history of domestic violence doesn't necessarily in—that wouldn't necessarily be psychologically significant in the evaluation of domestic violence

and its effects. So, I guess the answer would be no, it wouldn't necessarily be important.

*Q.* So you wouldn't consider other motivation for the shooting?

*A.* I'm not really sure how to answer that question. I mean, my job is not to understand the motivation underlying the shooting. My job is to understand the history of . . . domestic violence, how it affected her and whether or not it led her to act in self-defense.

Defendant testified that she never received any phone calls or correspondence from Denton while she was in jail. She claimed that Denton visited her twice, the first time for "under an hour and the second time lasted for about 10, 15 minutes." According to defendant, Denton told her at the second meeting that he was going to speak to Brooks and try to negotiate a plea deal with a sentence of 7 to 15 years or less. Defendant maintained that the next time that she saw Denton was when she walked into the courtroom for the plea hearing. After defendant pleaded guilty, she wrote a letter to Denton that stated:

> I'm writing you to—I'm writing to in regards to—to the plea hearing that occurred today at 1:30. What happened? Why was I not notified by you or your office or by Mr. Jacob Kolinski, your legal assistant who was with you today? Why didn't I get to meet or speak with you before the court—before court so you could explain what this plea deal you had was all about? How could you do this to me? What did I just plea to? How much time am I looking at? What is the difference of Open Murder and Second Degree Murder? I'm extremely confused, distraught, and frankly, I don't remember much about what happened today in court.

Defendant admitted that it was a priority for her to be able to be released from prison one day so that she could be with her children. Defendant also admitted that she told a different story about the shooting when she first spoke to a detective and persons at the forensic center. She initially did not tell the detective that she thought that Shimel was going to kill her that day. Later, defendant claimed that she did not tell the detective that she thought that Shimel was going to kill her because she wanted to protect her family from the media. Defendant admitted that she was an avid gambler and had financial problems. She "possibly" bounced two checks on the day of the shooting, and she "might have told" a friend that she could not support herself financially without Shimel. Defendant also admitted that she talked to her daughters on the phone from jail and tried to get them to remember the abuse that Shimel allegedly inflicted on her. Defendant testified that her daughters "probably" told her that they did not recall any abuse.

Defendant also acknowledged that her daughters testified at the preliminary examination that they did not recall any physical abuse.[3]

Grace Ombry, defendant's best friend in high school, testified that defendant began dating Shimel after she dropped out of high school in the beginning of her senior year in 1981. Defendant and Shimel moved into an apartment together in 1983 before they married. Ombry visited the apartment once, during which time defendant showed Ombry bruises on her leg and claimed that Shimel had beaten her. She also showed Ombry a gun that Shimel owned and said that Shimel had threatened her with it. Later in 1983, shortly after defendant and Shimel married, defendant told Ombry that she was unhappy and wanted to get a divorce because Shimel was mean to her. Ombry had not had regular contact with defendant since they were teenagers.

Brooks testified that from the beginning of the case, he believed that defendant had only two possible defenses—insanity and self-defense under a battered spouse theory. Brooks viewed defendant's videotaped statements to the police in which she admitted that she shot Shimel several times during an argument in their bedroom while three of their children were home. No other weapons were involved to suggest that defendant was in any danger. Brooks testified that in his early conversations with Denton, Denton mentioned that he was considering a self-defense defense under a battered spouse theory, but Brooks did not believe that the evidence supported such a defense. Brooks maintained that the police had spoken to "dozens and dozens" of people, and Brooks did not believe that there was any substantiating proof of any serious prior violent acts between defendant and Shimel. In fact, Brooks testified that all four of defendant's children "denied that they had ever seen any physical violence or threats of physical violence" between their parents. Brooks told Denton that, in his view, the shooting was precipitated by the couple's financial problems, and specifically defendant's gambling problem. Shimel was working extra jobs on the side to earn money for the family during the holidays, and funds were missing, including a recent payment for a job in the form of a check. Brooks learned from family members and a friend that Shimel was considering leaving the home and either divorcing or separating from defendant. According to Brooks, the physical evidence was also inconsistent with self-defense. Shimel suffered seven gunshot wounds to his back, two of which were fatal and would have disabled Shimel very quickly. Although the chamber of the gun held only seven bullets, Shimel suffered nine gunshot wounds. The theory that defendant reloaded the gun and then continued to shoot was consistent with the children's description of what they had heard from downstairs. Brooks reviewed Fischer's report and testified "with absolute certainty" that it would not have convinced him to change the plea offer or his

---

[3]It is unclear how old defendant's daughters were at that time, but they were younger than defendant's oldest son, who was 24, and older than her youngest son, who was 12 (footnote in original).

assessment of the strengths and weaknesses of his case.  Brooks viewed Fischer's report as contradictory and self serving.

The trial court granted defendant's motion to withdraw her plea.  With respect to counsel's performance and the first prong of the *Strickland*[4] test, the court stated:

> [C]ertain things, listening to the testimony, strike me.  One is that Mr. Denton spent, from the record, probably no more than 1.5 hours maximum time speaking to his client on a capital felony life offense without parole should she be convicted as charged.  Presumably it was an open murder, but let's assume it was a murder one that she was convicted of.  As no doubt the prosecution would argue.
>
> Mr. Denton spent approximately maximum of 1.5 hours time with the defendant before negotiating a plea that ultimately was taken.
>
> In my opinion, and I also find, that Mr. Denton did not meet with the defendant in—in jail or even in lockup prior to coming into the courtroom and having his client accept the plea after it was negotiated with Mr. Brooks.
>
> I believe the defendant when she indicates that the first time she saw Mr. Denton the day of the plea was when she walked into the courtroom here.
>
> I find it somewhat incredible that the lawyer would not go over the plea even the day of the plea one last time and say, do you really want to do this?  Do you understand what's going on? Not sitting at counsel table as does counsel right now for [defendant.]
>
> I find that he didn't do an investigation into what he could characterize as a duress defense, but probably more of a self-defense aspect of the case.  Even asking for an adjournment and an opportunity to do so, representing to the Court that he wanted to look into that defense.  And when he—I think he failed to thoroughly investigate the self-defense aspect of the case.
>
> He failed to inform her of what she was even in court for on the day she took the plea, to talk to her one last time as I already said.  I find that that's the case.  I believe her.
>
> And that he failed to discuss, also, the likely sentence or disclose the likely sentence based upon an adequate analysis of the

---

[4]*Strickland v. Washington*, 466 U.S. 668; 104 S. Ct. 2052; 80 L.Ed 2d 674 (1984) (footnote in original).

guidelines. And that's reflected by that—the—the—some of the exhibits that are here, and frankly, by the testimony.

There was no independent investigation of the self-defense aspect of the case. . . . In my opinion, he's testified that he primarily relied upon the prosecutorial representations as to the strength of their case without doing any independent investigation that I've heard of.

So, in my opinion, the first test of *Strickland* is met. I'm sorry. The test of *Strickland* is met. It's the test of *Strickland-Hill* then comes into play.

The trial court then addressed the second prong of the test, regarding prejudice resulting from counsel's deficient performance. In its ruling, the court declined to address the issue of prejudice under *Strickland* and *Hill v. Lockhart*, 474 U.S. 52 . . . (1985). The court stated:

*THE COURT*: The second prong, the *Hill* part of it requires that the defendant allege that but for his attorney's deficient performance, "she" in this case, would've gone to trial rather than pled guilty.

Well, of course, by the very nature of these motions that's what she's asserting here. That remains to be seen, her prerogative later on whether or not to make—do that or not.

Very difficult for me in light of some of the standards, as [the prosecutor] indicates here on the record, that I'm supposed to make some sort of educated guess rather was [sic] to likelihood of success, and I don't think—I think I can decline to do that.

One can certainly strongly argue that maybe a—a defense lawyer can convince a jury that it was either justifiable or perhaps voluntary manslaughter which would greatly reduce her sentence from what it presently is.

On the other hand, a jury could easily convict of first degree and/or second degree.

I want—on a personal note and I alluded to this with [the prosecutor], the transcript doesn't reflect the atmosphere that existed in this courtroom that I personally observed. A transcript is a black and white summary of what was said, basically and—not summary, but verbatim, what was said by me and what was said by her.

And I will indicate this. I—I know I thoroughly covered the aspects of the plea in this case. And there's a reason I did it. And the reason is, is I wasn't sure if she knew what was going on. I wasn't positive of it. And at the time, I assumed that she was fully aware of what the likely sentence would be. At least the sentencing guideline range.

Of course, I would have the prerogative to sentence her simply to life without a guidelines range as well. But I recall without even reading the transcript one of the things she said to me was that "I just wanted him to stop" or words to that effect. That's my recollection, and again, I didn't review—actually I didn't review the plea taking transcript for today. And prior to the *Ginther* hearing, I—I don't recall reviewing the transcript either then. But I remember her saying, vividly, "I just wanted him to stop." And that's when I went into, I think, and again, I didn't review it for today's purposes, but the self-defense and waiving defenses and the like.

And I did that because I was very cautious in that I really wanted to make sure she knew what she was doing by pleading guilty in light of a potential defense that she had.

And perhaps that will come back to haunt her, as [the prosecutor] suggests it should. But from a personal standpoint, I think she was confused.

And I did not know until the—after the fact, that Mr. Denton had not spoken to her that morning or afternoon prior to the plea taking process other than on the record here, that she met him for the first time in the courtroom. She testified to that, as I recall. And I believe her on that.

I tried my best to determine that she understood what was going on, the gravity of her plea and the likely course of action that I would take. I did find her plea was voluntarily (sic). But again, that plea—voluntariness was not found, ah, because I was aware [sic] that counsel hadn't informed her of these various and sundry things. And having heard that now on this post-sentence proceeding, I have to also find that in my opinion that based upon her ineffective assistance of counsel, that her plea was not knowingly and voluntarily made.

Accordingly, the trial court granted defendant's motion to withdraw her guilty plea.

*People v. Shimel*, No. 312375, 2013 WL 4006549, at *1–7 (Mich. Ct. App. Aug. 6, 2013).

The Michigan Court of Appeals reviewed the trial court's findings of fact for clear error and questions of constitutional law *de novo*. *Id.* at *7. The Michigan Court of Appeals reversed the trial court's grant of Shimel's motion to withdraw her plea, finding that she was not denied the effective assistance of counsel and that her plea was knowing and voluntary. *Id.* at *13.

Specifically, the court first found that "the trial court clearly erred by determining that Denton failed to conduct an investigation regarding a battered spouse self-defense theory and improperly substituted its judgment for that of trial counsel on a matter of trial strategy." *Id.* at *8. In so holding, the court relied on the following:

> The *Ginther* hearing testimony established that Denton is an experienced attorney, he was the elected county prosecutor for Saginaw County for four years beginning in 1972, and he had handled approximately two hundred homicide cases. Denton testified that he had spoken on several occasions with Dale Grayson at the National Clearinghouse for the Defense of Battered Women regarding the battered spouse syndrome defense and had obtained materials from Grayson regarding the defense. Denton was concerned about the fact that defendant fired several shots into Shimel's back, reloaded the gun, and continued to fire. He was also concerned that none of her four children had witnessed any physical abuse or threat of physical abuse to defendant, and there was very little evidentiary support to substantiate a history of physical abuse. Denton explained that he decided not to pursue the defense because he did not believe that "it could be sold to a jury." In fact, he testified that he believed that defendant would have been convicted of first-degree murder had she proceeded to trial. Because defendant's primary goal was to one day be released from prison in order to be with her children, Denton believed that a plea to second-degree murder was her best option.

*Id.*

The Michigan Court of Appeals also held that the trial court erred in its analysis of whether Shimel was prejudiced. *Id.* at *9–10. Relying on record evidence, the court found that Shimel "would not have received a better outcome if she had gone to trial and argued that she acted in self-defense based on a battered spouse theory," because of the lack of a history of domestic violence, the fact that seven of the bullets entered Shimel's body through his back, and Fischer's testimony that a successful battered spouse defense commonly results in second-degree murder charges—exactly the outcome Shimel received. *Id.* at *10. The court then considered

the voluntariness of Shimel's plea and found that even if Denton's performance was deficient, Shimel could not establish prejudice because "she chose to accept the same plea offer before her preliminary examination, but the offer was withdrawn because defendant's attorney at that time did not timely communicate defendant's acceptance of the offer to the prosecution." *Id.* at *11.

The Michigan Supreme Court denied Shimel's application for leave to appeal. *People v. Shimel*, 840 N.W.2d 312 (Mich. 2013).

Thereafter, Shimel filed a petition for a writ of habeas corpus in the federal district court. The district court denied Shimel's Petition, but granted her a certificate of appealability on her ineffective assistance of counsel claim. Shimel timely appealed.

II.

A.

In a 28 U.S.C. § 2254 habeas appeal, we review the district court's legal conclusions *de novo* and factual determinations for clear error. *Loza v. Mitchell*, 766 F.3d 466, 473 (6th Cir. 2014); *Dando v. Yukins*, 461 F.3d 791, 796 (6th Cir. 2006). A state court's determination of factual issues "shall be presumed to be correct" unless the petitioner rebuts this presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Federal habeas corpus relief is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under 28 U.S.C. § 2254(d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court's decision is an "unreasonable application" of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams v. Taylor*, 529 U.S. 367, 407–08 (2000). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous"—it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The phrase "clearly established Federal law" in § 2254(d)(1) "refers to the *holdings*, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412 (emphasis added); *see also Lopez v. Smith*, 135 S. Ct. 1, 4 (2014) (per curiam) ("Circuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced." (quoting *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013))).

The Supreme Court's holding in *Strickland v. Washington*, 466 U.S. 668 (1984), provides the "clearly established Federal law" relevant to Shimel's claim of ineffective assistance of counsel. *See Williams*, 529 U.S. at 391. To prevail, Shimel must first "show that counsel's performance was deficient" by "an objective standard of reasonableness," meaning that trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687–88. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. "Second, the defendant must show that the deficient performance prejudiced the defense," meaning that Shimel "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In the case of ineffectiveness in regard to the acceptance of a plea deal, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The *Strickland* inquiry coupled with AEDPA review is doubly hard to meet. *Harrington v. Richter*, 562 U.S. 86, 105 (2011); *Bell v. Cone*, 535 U.S. 685, 699 (2002).

B.

We are first tasked with determining to which state court decision we must defer. Generally, this court reviews the decision of "the last state court to issue a reasoned opinion on the issue[s]" raised in a habeas petition. *Joseph v. Coyle*, 469 F.3d 441, 450 (6th Cir. 2006) (internal quotation marks and citation omitted). In this case, the Michigan Court of Appeals was "the last state court to issue a reasoned opinion." *Id.*

Shimel argues, however, that this court should review the decision of the trial court and ignore the factual findings and legal conclusions of the Michigan Court of Appeals. She contends that "[d]eference must be given to both findings of fact and legal conclusions made by a trial court following a *Strickland* evidentiary hearing," which in this case would mean deferring to the credibility determinations and legal conclusions made by the trial judge at the *Ginther* hearing. Appellant Br. at 20–21. In contrast, the government contends that AEDPA deference is due to the opinion of the Michigan Court of Appeals. The government is correct: the Michigan Court of Appeals "is the last state court to adjudicate the claim on the merits" and its opinion is therefore "[t]he relevant state court decision." *Pudelski v. Wilson*, 576 F.3d 595, 607 (6th Cir. 2009). The cases cited by Shimel are not to the contrary.

In *Foster v. Wolfenbarger*, the defendant was convicted, the trial court conducted a *Ginther* hearing and found trial counsel ineffective for failing to investigate and present an alibi defense, and the Michigan Court of Appeals reversed, finding that the decision not to put on an alibi defense was a strategic decision. 687 F.3d 702, 707 (6th Cir. 2012). Then, on § 2254 review, the district court found that trial counsel was deficient, and this court agreed. *Id.* at 707–09. In arriving at its conclusion, the panel noted that this court "give[s] due deference to the conclusions of the trial judge on the effectiveness of counsel, because '[t]he judge, having observed the earlier trial, should have an advantageous perspective for determining the effectiveness of counsel's conduct and whether any deficiencies were prejudicial.'" *Id.* at 708 (quoting *Massaro v. United States*, 538 U.S. 500, 506 (2003)). This statement, however, must be read in light of the court's conclusion that the Michigan Court of Appeal's decision was an unreasonable application of clearly established Federal law. *Id.* at 709. Although the *Foster* court noted the trial court's superior position to assess credibility, it did not rely on the trial

court's ruling as a dispositive basis for granting relief. *See id.* at 708–09. Rather, it applied AEDPA deference to the opinion of the Michigan Court of Appeals. *See id.*

Likewise, *Ramonez v. Berghuis* does not require this court to ignore the findings of the Michigan Court of Appeals and defer to the determinations of the state trial court. 490 F.3d 482, 490 (6th Cir. 2007). In stating that "in the context of a *Strickland* evidentiary hearing, it is for the judge to evaluate the credibility of the criminal defendant and the former defense counsel in deciding what advice counsel had in fact given to the defendant during his trial, and such findings are entitled to the Section 2254(e)(1) presumption," this court was merely illustrating the distinction between credibility determinations within the judge's or jury's province. *Id.* Such a statement does not divest a state appellate court of its ability to review the factual findings and legal conclusions of a state trial court. As in *Foster*, the *Ramonez* court applied AEDPA's double deference to the opinion of the Michigan Court of Appeals. *Id.* at 486–87.

Nor does § 2254(e)(1) support Shimel's position. The statute speaks only to the factual determinations made by a "State court"—it does not differentiate between state trial and state appellate courts:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

It would be an inappropriate exercise of federal habeas review to ignore the factual and legal conclusions of the Michigan Court of Appeals and instead look to the state trial court's findings. *See Rose v. Lundy*, 455 U.S. 509, 518–19 (1982). Shimel's argument boils down to a complaint that the Michigan Court of Appeals unreasonably applied the state-mandated standard of review. This is not a ground on which we can grant habeas relief. As this court has previously opined, AEDPA sets forth "a precondition to the grant of habeas relief . . . not an entitlement to it." *Daniels v. Lafler*, 501 F.3d 735, 740 (6th Cir. 2007) (citing *Fry v. Pliler*, 551 U.S. 112, 119 (2007)). Therefore, we apply § 2254(e)(1)'s presumption of correctness to the factual findings of the Michigan Court of Appeals and AEDPA double deference to the legal conclusions of the Michigan Court of Appeals.

C.

Shimel must establish that trial counsel's performance was deficient and that his deficiencies prejudiced the defense. *Strickland*, 466 U.S. at 687. Although we have doubt that Denton's performance was deficient, we resolve Shimel's claim on the prejudice prong because there can be no finding of ineffective assistance of counsel without prejudice. *Phillips v. Bradshaw*, 607 F.3d 199, 216 (6th Cir. 2010) (citing *Strickland*, 466 U.S. at 691–92).

To satisfy the prejudice requirement in the context of guilty pleas, "the defendant must show that there is a reasonable probability that, but for counsel's errors, [s]he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. In the Sixth Circuit, a petitioner "cannot make that showing merely by telling [the court] now that she would have gone to trial then if she had gotten different advice." *Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012). "The test is objective, not subjective; and thus, 'to obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances.'" *Id.* (quoting *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010)). "[W]here the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *Hodges v. Colson*, 727 F.3d 517, 534 (6th Cir. 2013) (quoting *Hill*, 474 U.S. at 59). This is such a case, as Shimel contends that her counsel was deficient for his failure to present a theory of self-defense. "[I]n determining whether a defendant has shown prejudice, a court must predict whether correction of the deficient performance might have enabled the defendant to succeed at trial." *Id.* at 538.

With these considerations in mind, Shimel has not established a reasonable probability that, but for counsel's advice to plead guilty, she would have gone to trial. Nor has she proven that there is a reasonable probability that the presentation of a battered spouse syndrome theory of self-defense at trial would have resulted in a better outcome for her than a conviction of second-degree murder.

Shimel argues that she would have rejected the plea and insisted on going to trial and that she would have received a better outcome at trial. She asserts that at trial, she would have used Fischer's expert testimony on battered spouse syndrome "to explain the reasonableness of the battered spouse's perception that danger or great bodily harm is imminent, and also to rebut the prosecution's inference that the defendant could have left rather than kill the spouse." Appellant Br. at 33 (quoting *People v. Wilson*, 487 N.W.2d 822, 824 (Mich. Ct. App. 1992)). In response, the government contends that Shimel cannot show that she would have chosen to go to trial and that if she had, even with Fischer's expert testimony, she likely would have been convicted of the more serious charge of first-degree murder, which would have subjected her to a non-parolable life sentence.

Shimel was charged with open murder under Michigan Comp. Law 750.316, which "shall be punished by imprisonment for life without eligibility for parole." *Shimel*, 2013 WL 4006549, at *1. In contrast, second-degree murder pursuant to Michigan Comp. Law 750.317 "shall be punished by imprisonment in the state prison for life, or any terms of years, in the discretion of the court trying the same." In discussions with Denton, Shimel expressed her desire to have the opportunity to be released from prison and someday return to her four children. *Shimel*, 2013 WL 4006549, at *2, 4. Therefore, Denton's belief that "the second-degree murder plea was a good option because it would give defendant a chance to be released from prison one day" was reasonable. *Id.* at *2. Indeed, Shimel was sentenced to eighteen to thirty-six years in prison, which leaves open the possibility that she might be reunited with her children someday. Nowhere has Shimel stated that if she had better advice or spent more time with her trial counsel, she would not have pled guilty; nor would a reasonable person have chosen to proceed to trial under the circumstances. Shimel's statement in her briefs that she would have rejected the plea agreement and insisted on going to trial are belied by the fact that she had agreed to plead guilty to second-degree murder prior to her preliminary examination but, because of a miscommunication between her former counsel and the prosecutor, the deal expired. *Id.* at *1. Shimel's statements to the contrary are insufficient to rebut the Michigan Court of Appeals' findings on this matter. *See* 28 U.S.C. § 2254(e)(1). A reasonable defendant in Shimel's situation would have accepted the second-degree murder plea, especially in light of the prosecutor's stance that, even with expert testimony on battered spouse syndrome, he would not

have further reduced the charge to manslaughter. *See Shimel*, 2013 WL 4006549, at *2, *4. In reaching this conclusion, the Michigan Court of Appeals did not unreasonably apply clearly established Federal law. *Id.* at *11.

Even assuming that a reasonable defendant in Shimel's position would have rejected the second-degree murder plea agreement, she has failed to establish a reasonable probability that expert testimony on battered spouse syndrome would have improved her result. Michigan law does not permit a defendant to plead battered spouse syndrome as a freestanding defense but rather as part of a self-defense claim. *See Seaman v. Washington*, 506 F. App'x 349, 360 (6th Cir. 2012) (citing *People v. Christel*, 537 N.W.2d 194, 202 (Mich. 1995)). "In Michigan, the killing of another person in self-defense is justifiable homicide if the defendant honestly and reasonably believes that [her] life is in imminent danger or that there is a threat of serious bodily harm." *People v. Heflin*, 456 N.W.2d 10, 18 (Mich. 1990). Shimel would have been unable to meet this burden. Her husband suffered nine gunshot wounds, seven of which entered his body through his back, *Shimel*, 2013 WL 4006549, at *1, which weighs against a self-defense theory. *See Cain v. Redman*, 947 F.2d 817, 822 (6th Cir. 1991). Further, the government would have presented evidence that "the shooting was precipitated by the couple's financial problems, and specifically defendant's gambling problem" and that Shimel had reloaded the gun and then continued to shoot her husband. *Shimel*, 2013 WL 4006549, at *4. There is no reasonable probability that Shimel's battered spouse syndrome self-defense theory would have succeeded at trial. Shimel is unable to establish prejudice, and therefore, her claim for habeas relief fails.

III.

For the reasons stated above, we affirm.