RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0299p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

TIMOTHY L. COLEMAN,

                *Petitioner-Appellant*,

   *v*.

MARGARET BRADSHAW, Warden,

                *Respondent-Appellee*.

No. 15-3442

───────────────

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 3:03-cv-00299—Edmund A. Sargus, Jr., District Judge.

Argued: January 29, 2020

Decided and Filed: September 4, 2020

Before: BATCHELDER, GRIFFIN, and BUSH, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Timothy F. Sweeney, LAW OFFICE OF TIMOTHY F. SWEENEY, Cleveland, Ohio, for Appellant. Margaret Moore, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Timothy F. Sweeney, LAW OFFICE OF TIMOTHY F. SWEENEY, Cleveland, Ohio, John P. Parker, Cleveland, Ohio, for Appellant. Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

───────────────

## OPINION

───────────────

ALICE M. BATCHELDER, Circuit Judge. An Ohio prisoner, sentenced to death, appeals the denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. We **AFFIRM**.

# I.

On January 2, 1996, Timothy Coleman killed Melinda Stevens to keep her from testifying against him at his trial on charges of drug trafficking. The grand jury indicted Coleman in March 1996 for aggravated murder. *See* Ohio Rev. Code Ann. § 2903.01(A) (1996). Count 1 of the indictment attached a capital-specification for his killing a witness to prevent her testimony, *see id.* § 2929.04(A)(8), as well as a firearm-specification, *see id.* § 2929.71. Count 2 charged Coleman with unlawful possession of a firearm. *See id.* § 2923.13.

In February 1997, a jury convicted Coleman of both counts and recommended a death sentence. The Ohio trial court sentenced him to death and four-and-a-half years in prison. Coleman unsuccessfully sought relief on direct appeal. *See State v. Coleman*, 707 N.E.2d 476 (Ohio 1999), *cert. denied*, 528 U.S. 954 (1999). The Supreme Court of Ohio recounted the pertinent facts as follows:

> On the night of January 2, 1996, Melinda Stevens was shot to death in an alley behind Riddle's Ribs in Springfield, Ohio. Timothy Coleman, appellant, was convicted of her aggravated murder and sentenced to death.
>
> During the previous summer, Stevens had worked as a confidential informant for the Springfield police and made controlled purchases of drugs from suspected drug dealers. On three separate occasions, Stevens made purchases of crack cocaine from Coleman, which were observed and recorded by the police.
>
> As a result of these sales, a grand jury indicted Coleman in September 1995 for aggravated trafficking in cocaine and associated possession offenses. Stevens was a material witness to these offenses, but her identity was not listed in the indictment. Coleman pled not guilty to these charges.
>
> While in jail awaiting trial for these charges, Coleman told his cellmate, James R. White, that he had discovered that Stevens was the one that "got him busted" and that "if he [Coleman] got out on bond, he was going to take care of her." According to White, Coleman stated that he had a newborn baby, was facing fifteen to forty-five years on the pending drug charges, and "couldn't * * * do that much time in the joint." Coleman had known White for years and asked him to "take care" of Stevens if White got bailed out first. However, Coleman was released first on October 12. Another inmate, Donovan Hayes, testified that he heard Coleman tell White "[t]hat if it was her [Stevens] that was responsible for him being here, he would have to do something to her."
>
> White was released from jail in mid-November and testified that Coleman again asked him to help "take care" of Stevens. They talked about burning down

Stevens's house or the possibility of White shooting her. Early on January 2, 1996, Coleman saw White twice and told White he would pick him up that evening to take care of Stevens, but Coleman never showed up. On January 3, after Stevens had been killed, Coleman told White that "he took care of his business."

Christopher Holtz testified that he saw Stevens and Coleman on the evening of January 2, 1996 around 7:00 or 8:00 p.m. at Riddle's Ribs, apparently buying takeout food. Holtz recalled that Coleman was wearing a flannel-type shirt and that Stevens and Coleman left Riddle's together around the same time Holtz did. Holtz last saw the two alone in a nearby alley. The weather that evening was cold, windy, and snowing. As Holtz was walking home, he heard shots.

Around 7:25 p.m., police and paramedics responded to the alley behind West Pleasant Street near Riddle's Ribs, the scene of a shots-fired report. They found Stevens lying face up with no pulse or respiration and only minimal heart activity. Although the paramedics took Stevens to the hospital, the coroner later concluded that Stevens had died at 7:20 p.m. on January 2, 1996. Icy rain had fallen that evening, followed by heavy snow and strong winds, thereby hampering investigative efforts.

Coleman frequently visited the house of Fayette Strodes in Springfield. Strodes's granddaughter, Dana, had a child by Coleman, and Fayette's son, James Strodes, was Coleman's friend. Prior to January 2, 1996, Coleman told Fayette several times that "he was going to kill [a] black bitch" to whom he had sold drugs because she was a "drug informant." Vera L. Strodes, Fayette's daughter, also recalled Coleman discussing his legal problems, saying, "he's not going to do any time," and also talking about "popping that bitch."

Coleman also talked frequently with Lynnda M. Gaskins, who lived across the street from Fayette. Gaskins testified that Coleman talked constantly about his legal problems and that he had found out that Stevens was the confidential informant in the case against him. Gaskins further testified that Coleman stated, "[i]f they don't have a witness, they don't have a case," and also said, "he was going to kill her."

Hope Strodes, Fayette's granddaughter, recalled that Coleman visited the Strodeses' house early on the evening of January 2, and asked her for some bullets. Hope told him that there was a box of bullets on a shelf. Coleman took some bullets, showed Hope a silver gun with a clip, and said, "I'm going to go take care of a bitch that set me up."

Around 7:30 p.m. that same evening, Coleman stopped in for a few minutes to see Gaskins and told her, "I took care of my business." When asked what he meant, Coleman replied, "Bloop, bloop, two to the back of the head * * *. The bitch fell like a rock," while demonstrating at the same time what happened by physically falling to the floor. After January 3, Coleman again talked with Gaskins and

disclosed to her that the murder occurred in an alley behind Riddle's Ribs and that he had slowed down while walking in order to shoot Stevens from behind.

After Coleman left Gaskins's house that night, he went back to the Strodeses' residence. Hope, Vera, and Fayette all testified that Coleman did not look normal and was nervous. Vera testified that he was wearing a flannel shirt that had cockleburs on it. Coleman told Fayette that he "had took care of it." When she asked what, he said "Melinda" and "twice in the head" because he "couldn't do that many years."

On January 3, 1996, police interviewed Coleman after advising him of his rights. Coleman asserted to police that sometime after 7:00 p.m. on January 2, Stevens came to the house of Coleman's daughter, next to Riddle's Ribs, and asked him for money to buy food for her children. Coleman told her he was not going to give her money, but that he would walk over there and pay it for her. After going to Riddle's and paying for the food, Coleman stated that he left, did not see Stevens again, and did not know she had been murdered.

Coleman later talked with Vera Strodes about the fact that people on the street were saying that he shot Stevens. At first, Coleman denied shooting Stevens, but later admitted to Vera that he "did take the bitch out." While in jail awaiting trial, Coleman described the murder to fellow inmate Antwan Warren, revealing that while he was walking out of the restaurant with Stevens, he "slowed down his step and shot her."

Dr. Robert Stewart, a forensic pathologist, concluded that Stevens died as a result of two gunshot wounds, one to the back of her head and one to the base of her neck. The first bullet stopped at the front-left side of her brain. The second bullet shattered the first vertebra and severed her spinal cord, traveled upward into the sinus cavity, and lodged just under the cheek skin.

Because the weather stayed cold until mid-January, ice and snow remained on the ground, hampering efforts to secure physical evidence at the murder scene. One officer estimated that on January 3, there were two inches of ice and four inches of closely packed snow in the alley. Eventually, on January 17, police officers found two spent .380 caliber shell casings near a bloodstain remaining in the alley.

A forensic expert identified the two bullets removed from Stevens's body as .380 caliber bullets fired from an automatic or semiautomatic firearm, particularly either a Colt government model or a Davis P-380. The Davis P-380 comes in either steel or chrome models. Gunpowder residue on Stevens's clothing indicated that she had been shot from less than four feet away.

In May 1996, Coleman shared a prison cell with Steven L. Kasler, an inmate at an Ohio correctional center. Coleman told Kasler that he was awaiting trial for killing a drug informant named Melinda Stevens, and that he thought "if he killed her * * * he could beat his drug charges." Coleman said he shot Stevens twice in the back of the head using a Davis P-380. He also told Kasler that he shot her in

an alley under "pretty severe, blizzard conditions" because he thought the weather would hamper the investigation. He then disclosed to Kasler that he had gotten rid of his gun and hidden his clothes in a doghouse in Fayette's back yard. In fact, police never found the murder weapon, but did recover from the Strodeses' doghouse a tennis shoe and a flannel shirt identified as clothing that Coleman wore on January 2.

*Coleman*, 707 N.E.2d at 480–82.

Following his direct appeal, Coleman unsuccessfully pursued postconviction relief in state court. *See State v. Coleman*, 707 N.E.2d 476, 491 (Ohio 1999) (affirming convictions and sentence on direct appeal); *State v. Coleman,* No. 2001-CA-42, 2002 WL 31242241, at *15 (Ohio Ct. App. Oct. 4, 2002) (affirming state trial court's judgment that denied petitioner-appellant's petition for post-conviction relief), *appeal denied*, 784 N.E.2d 711 (Ohio Mar. 12, 2003) (table decision). While Coleman's first petition for postconviction relief was pending before the Ohio appellate court, he returned to the Ohio trial court and, on January 24, 2002, filed a motion for relief from judgment, a motion for a new trial, and a successive petition for postconviction relief, all raising the same two claims: (1) he was actually innocent, and (2) the State withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The trial court overruled the motions and dismissed the petition without a hearing, *State v. Coleman*, Nos. 95-CR-0484/96-CR-0142 (Ohio C.P. July 21, 2004), and the Ohio appellate court affirmed, *State v. Coleman*, Nos. 04CA43/44, 2005 WL 1797040, at *8 (Ohio Ct. App. July 29, 2005), *appeal denied*, 840 N.E.2d 203 (Ohio 2005) (table decision).

On August 22, 2003, Coleman filed his federal habeas petition, raising eight claims. The magistrate judge issued an initial report, *Coleman v. Bradshaw*, No. 3:03-cv-299, 2012 WL 6002469, at *72 (S.D. Ohio Nov. 30, 2012), and a supplemental report, *Coleman v. Bradshaw*, No. 3:03-cv-299, 2013 WL 3367092, at *16 (S.D. Ohio July 5, 2013), recommending in both that Coleman's petition be dismissed. The district court adopted the magistrate judge's recommendation and denied the petition. *Coleman v. Bradshaw*, No. 3:03-cv-299, 2015 WL 1468279, at *4 (S.D. Ohio Mar 30, 2015). The district court granted a certificate of appealability (COA) on two issues: (1) whether the prosecution withheld exculpatory evidence in violation of *Brady*, and (2) whether Coleman's trial counsel rendered ineffective assistance during the penalty phase of the trial. Coleman timely appealed and moved this court to expand the COA,

but we denied his motion.  Our review is therefore limited to Coleman's *Brady* claim and his ineffective-assistance-of-counsel claim.

**II.**

Because Coleman filed his federal petition in 2003,[1] we apply the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, *codified at* 28 U.S.C. § 2254, *et seq.*; *see Lindh v. Murphy*, 521 U.S. 320, 326–27 (1997).  Claims adjudicated on the merits in state court are barred in federal habeas proceedings unless the state-court decision meets one of the exceptions outlined in 28 U.S.C. § 2254(d).  *Harrington v. Richter*, 562 U.S. 86, 98 (2011).  Habeas relief may be granted if the state court judgment (1) "was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding."  28 U.S.C § 2254(d).

In analyzing whether a state-court decision is contrary to or an unreasonable application of federal law, we look only to clearly established Supreme Court precedent that existed when the state court rendered its decision.  *Greene v. Fisher*, 565 U.S. 34, 38 (2011).  A state-court decision is contrary to that precedent if the state court's reasoning or result contradicts that precedent.  *Early v. Packer*, 537 U.S. 3, 8 (2002).  And the state court unreasonably applies clearly established law when it correctly identifies the governing legal rule but applies it unreasonably to the facts.  *White v. Woodall*, 572 U.S. 415, 426 (2014).  The application must have been "objectively unreasonable" such that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at 419–420 (quoting *Harrington*, 562 U.S. at 103).

---

[1]Coleman filed his federal habeas corpus petition five months after he finished his first round of state postconviction proceedings but while the second round was still pending in the Ohio trial court.  The district court did not issue a decision on Coleman's petition until March 30, 2015, long after Coleman exhausted his second round of state postconviction proceedings.

## A.

Coleman's *Brady* claim is based on evidence that William Sapp, a death row inmate, confessed to killing Melinda Stevens.  In April 1997, a month after Coleman was sentenced to death for the murder of Stevens, police officers questioned Sapp about the unrelated murders of two girls.  *Coleman*, 2012 WL 6002469, at *19.**2**  Sapp later claimed that, during the interview with the officers, he had confessed to killing Stevens.  *Id.*

In July 1998—about a year after the interview—Sapp sent a letter to Uma Timmons ("Sapp Letter") while he was serving a sentence for feloniously assaulting, kidnapping, and attempting to rape Timmons.  *Id.* at *13.  In his letter, Sapp threatened Timmons for testifying against him and reminded her that he had killed her friend "over off of Pleasant."  *Id.*

In July 2001, while Coleman's first petition for postconviction relief was pending before the Ohio appellate court, he received a letter from an attorney not otherwise involved in Coleman's case.  The attorney wrote: "I was told, by a person in a position to know, that another prisoner on death row wishes to confess publicly to the murder for which you have been convicted."  R. 231-16, PageID: 6049.  One month later, Coleman's attorney prepared for Sapp an affidavit ("Sapp Affidavit") in which Sapp swore (1) that he had killed Stevens and (2) that he had confessed to the murder to police officers in April 1997.

Coleman relied on the Sapp Affidavit and the Sapp Letter to file a motion for relief from judgment, a motion for a new trial, and a second petition for postconviction relief.  The motions and the petition raised the same two claims: (1) he was innocent based upon newly discovered evidence showing that Sapp had confessed to murdering Stevens, and (2) the state violated *Brady* when it failed to disclose evidence indicating Sapp was responsible for Stevens's murder.

The Ohio trial court overruled the motions and dismissed the petition without a hearing, *State v. Coleman*, Nos. 95-CR-0484/96-CR-0142 (Ohio C.P. July 21, 2004), and the Ohio court

---

**2**Sapp was convicted of and sentenced to death for the murders.  *See generally State v. Sapp*, 822 N.E.2d 1239 (Ohio 2004).

of appeals affirmed, *Coleman*, 2005 WL 1797040, at \*8 (Ohio Ct. App. July 29, 2005).[3]  The Ohio appellate court first considered the Sapp Affidavit in the context of Coleman's actual-innocence claim:

> The trial court held that [Coleman's] claim of actual innocence is wholly without merit because it is founded upon Sapp's affidavit, which lacks any credibility. We find that in so holding the trial court did not abuse its discretion, as that term is defined by law, in rejecting Sapp's affidavit for lack of credibility.  The court noted that Sapp is a convicted double murderer who is under a sentence of death and has nothing to lose by claiming responsibility for another murder.  The timing of Sapp's affidavit also renders its validity suspicious, because it was prepared and notarized by [Coleman's] own attorney just two months after the trial court had denied [Coleman's] first post-conviction petition.  The psychological report on Sapp prepared by [a clinical psychologist] for use in his double murder case mentions Sapp's "chronic lying."

*Coleman*, 2005 WL 1797040, at \*5 (internal citation omitted).

The Ohio appellate court explained that the Sapp Affidavit was contradicted by the overwhelming evidence of Coleman's guilt that was presented at trial:

> Sapp's claim that he was with Melinda Stevens minutes before he killed her is contradicted not only by [Coleman] himself, who admitted to police that he was with Stevens at Riddles Ribs moments before she was shot, but also by the testimony of Christopher Holtz, who saw [Coleman] and Stevens leave Riddles Ribs together and walk into the alley behind Riddles Ribs.  Moments later, Holtz heard gunshots.  Furthermore, no less than seven witnesses testified at [Coleman's] trial, his friends and jail buddies, about how [Coleman] bragged that he was going to kill Stevens for her role in his being arrested and charged with drug offenses, and then, after the fact, about how he had killed Stevens.

*Id.* at \*6.  Finally, the Ohio appellate court held that "the trial court could reasonably reject Sapp's affidavit for lack of credibility, as it did, because while the evidence at trial shows that [Coleman] had ample motive and opportunity to kill Stevens, Sapp's affidavit fails to believably portray either." *Id.*

---

[3]Coleman argues that the Ohio trial court's failure to conduct a hearing resulted in a decision that was based on an unreasonable determination of the facts, *see* 28 U.S.C. § 2254(d)(2), and AEDPA deference should not apply.  But an evidentiary hearing is not required for AEPDA deference to apply.  Rather § 2254(d) "applies to factual determinations made by state courts, whether the court be a trial court or an appellate court." *Sumner v. Mata*, 449 U.S. 539, 547 (1981).  We therefore afford AEDPA deference to the Ohio appellate court's decision.

The Ohio appellate court then reached Coleman's *Brady* claim and dealt with the Sapp Affidavit in a single sentence: "As we previously discussed, the trial court properly rejected Sapp's affidavit because it lacks any credibility." *Id.* at \*7. The court found that the Sapp Letter did not constitute *Brady* material because the letter failed to identify the victim, so the jury would have to speculate whether Sapp was referring to Stevens's murder. *Id.* The Ohio appellate court therefore held that the Sapp Letter was "simply too indefinite in its nature to be material to [Coleman's] guilt or innocence with respect to the killing of Melinda Stevens." *Id.*

We agree with the district court that the decision of the Ohio court of appeals neither contravened nor unreasonably applied clearly established Supreme Court precedent. *See Coleman*, 2015 WL 1468279, at \*4; *Coleman*, 2012 WL 6002469, at \*24. The state must disclose evidence that is favorable to the accused and material to guilt or punishment. *See Brady*, 373 U.S. at 87. Evidence is favorable if it is either exculpatory or impeaching. *See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). In other words, evidence is material if the state's failure to reveal exculpatory evidence was prejudicial to the defendant. *See Strickler*, 527 U.S. at 289, 296. The defendant thus bears the burden of proving that "(1) the withheld evidence was favorable to the petitioner, (2) the evidence was suppressed by the government, and (3) the petitioner suffered prejudice." *Jells v. Mitchell*, 538 F.3d 478, 501 (6th Cir. 2008) (citing *Strickler*, 527 U.S. at 281–82.).

The Warden argues that *Brady* does not apply to Sapp's April 1997 confession or to Sapp's July 1998 letter because both came into existence after Coleman was sentenced in February 1997. The Warden points to the lack of any clearly established Supreme Court precedent in 1997 that extended *Brady*'s obligations to postconviction settings. Indeed, in *District Attorney's Office v. Osborne*, 557 U.S. 52, 67–69 (2009), the Supreme Court rejected a petitioner's claim to a due process right to DNA testing in postconviction proceedings. The Supreme Court explained "that nothing in our precedents suggest[] that [*Brady*'s] disclosure obligation continue[s] after the defendant [is] convicted and the case [is] closed." *Id.* at 68. The

Warden therefore argues that "the state courts would have been entitled to reject Coleman's *Brady* claim on purely legal grounds." Resp't's Br. at 73.

But the Ohio courts did apply *Brady*, *see Coleman*, 2005 WL 1797040, at *1, *7; *Coleman*, Nos. 95-CR-0484/96-CR-0142 (Ohio C.P. July 21, 2004), and AEDPA requires this court to review the actual grounds on which the state court relied, *see Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). And the Ohio courts' application of *Brady* was neither contrary to nor an unreasonable application of, clearly established Supreme Court precedent. In 2005, some federal courts extended *Brady*'s disclosure obligation to the postconviction setting. *See, e.g.*, *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001); *Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997). And *Osborne*, does not *forbid* a state court's application of *Brady* to posttrial proceedings.

Nonetheless, Coleman's *Brady* claim fails to overcome the AEDPA bar. The Ohio appellate court reasonably determined that the Sapp Letter was not material. As the Ohio court explained, the Sapp Letter failed to identify a victim; jurors would necessarily have had to speculate about whether the letter referred to Stevens. Hence, Coleman failed to establish a reasonable probability that, had the Sapp Letter been promptly disclosed to the defense in July 1998, a different jury would have reached a different result.

Coleman does not contend that the state should have disclosed the Sapp Affidavit. After all, it was not the state but Coleman's attorney who obtained the affidavit from Sapp in August 2001. The affidavit itself is therefore not *Brady* evidence: It is evidence of alleged *Brady* evidence (i.e., evidence of Sapp's April 1997 confession). The Ohio appellate court determined that the Sapp Affidavit lacked any credibility; the necessary implication is that Coleman failed to establish that Sapp's April 1997 confession ever occurred. Because Coleman failed to establish that there was any *Brady* evidence, he necessarily failed to establish that the state suppressed such evidence.

The state court reasonably rejected Coleman's *Brady* claim. The holding neither contradicted or unreasonably applied clearly established Supreme Court precedent nor was it

based on an unreasonable determination of the facts.  Coleman's *Brady* claim is barred from federal review.

**B**.

We turn to Coleman's claim that his counsel was ineffective in the penalty phase of his trial ("IAC-mitigation claim").  Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), Coleman had to show both that his counsel's performance was constitutionally deficient and that this deficiency prejudiced him.  "The combined effect of *Strickland* and [AEDPA] is 'doubly deferential' review."  *Foust v. Houk*, 655 F.3d 524, 533 (6th Cir. 2011) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)).  "The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Harrington*, 562 U.S. at 105.

The Ohio state courts considered Coleman's IAC-mitigation claim on the merits.  The Ohio Supreme Court held this claim meritless on direct appeal, summarizing the mitigation testimony this way:

> In mitigation, Coleman presented the testimony of his father, who stated that [Coleman] was "pretty much like any other kid."  He testified that Coleman had been active in Boy Scouts and in sports, was generally obedient but somewhat "hardheaded" at times.  [Coleman] had a normal childhood, and nothing in his father's testimony suggests strong mitigating factors as to [Coleman's] history, character, and background.  The defense presented no other evidence, and Coleman neither testified nor made an unsworn statement.

*Coleman*, 707 N.E.2d at 490 (paragraph break omitted).

Coleman raised the claim again in his first round of postconviction proceedings, submitting affidavits from several witnesses.  *See Coleman*, 2002 WL 31242241, at *7–11.  The Ohio trial court denied the claim solely on *Strickland*'s prejudice prong. *Coleman*, 96-CR-0142; *see Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.").  The Ohio appellate court fully reviewed the trial court's decision and affirmed. *Coleman*, 2002 WL 31242241, at *7–10.

We afford double deference to the Ohio appellate court's decision, the last reasoned state court decision on the issue, *see Shimel v. Warren*, 838 F.3d 685, 696 (6th Cir. 2016), and ask whether trial counsel's performance prejudiced Coleman in the sentencing phase of his trial.[4] We ask whether the state court evaluated the totality of the available mitigation evidence—both that adduced at trial and the evidence adduced in the post-conviction-relief proceeding—and re-weighed it against the evidence in aggravation, *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000), to determine whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.[5]

Coleman makes several subclaims to support his IAC-mitigation argument. Specifically, Coleman argues that he was prejudiced by counsel's failure to adequately prepare the only mitigation witness to testify at trial and by counsel's failure to present testimony from certain family members and his girlfriends. He goes on to argue that competent counsel would have presented evidence of his good behavior and his employment, as well as testimony from cultural

---

[4]Coleman argues that he is entitled to a presumption of prejudice because his counsel's performance was so deficient that counsel was "effectively absent during mitigation." Pet'r's Br. at 64. To be sure, a petitioner might be entitled to such a presumption if "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Bell v. Cone*, 535 U.S. 685, 696 (2002) (quoting *United States v. Cronic*, 466 U.S. 648, 659 (1984)). But the presumption of prejudice applies only when there is a *complete* denial of counsel, *Cronic*, 466 U.S. at 659, or when counsel *entirely* fails to subject the prosecution's case to adversarial testing, *Bell*, 535 U.S. at 696. A petitioner is not entitled to a presumption of prejudice because his counsel was deficient "at specific points" of the proceeding. *Id.* at 697. Here, Coleman's father testified at the penalty phase of the trial. Coleman is therefore not entitled to a presumption of prejudice because he was not completely denied counsel during the mitigation phase. Nor did his counsel fail to oppose the prosecution throughout the sentencing proceeding.

[5]The magistrate judge's reports and recommendations, *see Coleman*, 2012 WL 6002469, at *55–57, *supplemented*, 2013 WL 3367092, at *5, and the district court's opinion and order, *see Coleman*, 2015 WL 1468279, at *1–4, conduct an independent inquiry into whether Coleman showed ineffective assistance under *Strickland*'s two-prong test and therefore step outside of AEDPA's deferential standard of review. *See Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable . . . ."). We therefore give no weight to the district court's determination that Coleman's trial counsel was constitutionally deficient, *see Coleman*, 2015 WL 1468279, at *1–4; *Coleman*, 2012 WL 6002469, at *56–57, because the state court reasonably denied Coleman's IAC-mitigation claim solely on *Strickland*'s prejudice prong.

and psychological experts.  Finally, Coleman asserts that counsel was constitutionally ineffective by failing to deliver a cogent closing argument.[6]

*Failure to prepare the only mitigation witness:* Coleman argues that his counsel was constitutionally deficient in failing to prepare Coleman's father, the mitigation witness, for his testimony at the penalty phase.  *See Hamblin v. Mitchell*, 354 F.3d 482, 491–94 (6th Cir. 2003).  Coleman fails to assert what his father would have testified to had he been better prepared and thus fails to establish how he might have been prejudiced by any lack of preparation.  We find this subclaim meritless.

*Testimony from Coleman's mother, sister, and girlfriends*: Coleman argues that his trial counsel should have presented the testimony of his mother, his sister, and his girlfriends (i.e., the three mothers of his five children).  He says that his mother would have testified that he "was a loving son and that he had suffered from dyslexia as a child, which in turn affected his academics."  R. 170, PageID: 1966.  Coleman's trial counsel asked Coleman's father about his son's mother at the penalty phase.  Coleman's father said the mother was present but that she was too upset to testify.  The Ohio appellate court held that counsel "can hardly be faulted for not calling [Coleman's mother] to the stand after she indicated she was too upset to testify." *Coleman*, 2002 WL 31242241, at *8.

Coleman says that his sister would have testified that he was a loving and protective older brother.  The Ohio court held that the sister's testimony "was merely cumulative to that of her father's and there was no likelihood that the outcome of the sentencing hearing would have been different if counsel had presented her testimony." *Id.*

---

[6]Coleman also argues that his trial counsel exhibited racial animus toward him and was merely going through the motions of his trial.  He presented this argument to prove that he was denied effective assistance of counsel in the guilt phase of his trial, as well as the penalty phase.  The magistrate judge analyzed this evidence only in the context of Coleman's IAC claim in the guilt phase. *See Coleman*, 2012 WL 6002469, at *41.  The district court addressed the argument in the context of the penalty phase but ultimately dismissed Coleman's claim. *See Coleman*, 2015 WL 1468279, at *2.  Coleman failed to develop the argument on appeal, making only passing reference to it in his brief.  We therefore decline to address this argument further. *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) (explaining that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Coleman also argues that his trial counsel should have presented the testimony of his five children's three mothers who would have testified that he was a responsible, loving father. The Ohio appellate court determined that the trial court properly rejected this subclaim:

> [T]rial counsel may not have wished to diminish the poignant testimony of Coleman's father with the testimony of the women who Coleman had impregnated but never married. [T]o show prejudice from counsel's failure to present mitigating evidence there must be a reasonable probability that the evidence would have swayed the jury to impose a life sentence. *State v. Keith*, [684 N.E. 47, 65 (Ohio 1997) (citing *Strickland*, 466 U.S. at 687))].

*Id.* at *7.**7**

The state court reasonably determined that Coleman was not prejudiced by the lack of testimony from his mother, sister, and his children's mothers. We agree with the district court's conclusion that

> [t]he majority of the information contained within the affidavits offered during postconviction was either cumulative (that he was a loving person) or did not rise to the level that a reasonable jurist would have found that it outweighed the aggravating circumstance. While [Coleman] may have been a responsible and loving father to his children (although one doubts a jury would have found him responsible in having five children by three different women), he was found guilty of killing a mother of five. Likewise, testimony of a learning disorder in school would not likely have weighed strongly on the jury in balancing mitigation and the aggravating circumstances.

*Coleman*, 2012 WL 6002469, at *58; *see also Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) ("[I]n order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing.").

*Evidence of Coleman's good behavior while incarcerated:* Coleman argues his trial counsel failed to present evidence of his good behavior while incarcerated. *See Skipper v. South Carolina*, 476 U.S. 1, 4–5 (1986). He contends that one of the deputy sheriffs who transported Coleman from his jail cell to the courtroom during his trial would have testified that: "At no time

---

**7**One of the three mothers who submitted an affidavit was Dana Strodes. In 1992, Strodes told police that Coleman had shot her. *Coleman*, 2002 WL 31242241, at *7. As the state court pointed out, the prosecution could have presented this evidence if Coleman's counsel had called Strodes to testify. *Id.*

during the six day trial did I observe Mr. Coleman misbehave or present any kind of resistance while under my supervision," and that "no special security [was] required for Mr. Coleman during this time." R. 231-10, PageID: 4969.

The state court reasonably held that even if counsel had presented the testimony of the deputy sheriff, "there is no reasonable probability that the jury's sentence would have been different." *Coleman*, 2002 WL 31242241, at *10. We agree with the magistrate judge's explanation that "six days of good behavior while on trial for one's life is hardly very persuasive mitigation evidence," *see Coleman*, 2013 WL 3367092, at *6, and note the district court's observation that presenting such testimony might have reminded jurors that, while incarcerated for his drug-trafficking charges, Coleman recruited a fellow inmate to help "take care" of Melinda Stevens, *Coleman*, 2012 WL 6002469, at *1, *63; *see Coleman*, 2015 WL 1468279, at *3. It is therefore not reasonably probable that introduction of this evidence would have changed the result of Coleman's trial.

*Evidence of Coleman's employment*: Coleman submitted employment records indicating that he worked in a factory for almost three months, from November 13, 1995 until February 5, 1996. He contends that these employment records would have shown jurors that he "was a good worker and was making an attempt to lead a crime-free life." R. 9, PageID: 22. The Ohio appellate court affirmed the trial court's finding that "nothing in the claim . . . suggested a reasonable possibility that the sentence imposed upon Coleman would have been different had this mitigation evidence been presented." *Coleman*, 2002 WL 31242241, at *10.

The state court's holding was reasonable. Coleman's employment records "reflect an employment period of three months and contain mediocre reviews, absenteeism, and tardiness." *Coleman*, 2012 WL 6002469, at *59. Coleman therefore cannot show prejudice based on the employment records.

*Evidence from a cultural expert*: Coleman faults his trial counsel for failing to present a cultural expert. In his federal habeas petition, Coleman explained that:

> [e]vidence from a cultural expert . . . would have helped the jury understand why [Coleman] turned to a life of drug dealing, despite the fact that he had a stable

family life, due to the myriad of problems and unique cultural pressures facing young black males in urban environments.

R. 9, PageID: 22. Coleman supported this subclaim, not with affidavits from cultural experts, but with affidavits from his mother and father. The Ohio appellate court held that such testimony would neither mitigate the fact that Coleman executed the mother of five children nor overcome the aggravating circumstances presented by the prosecution. *Coleman*, 2002 WL 31242241, at *10. The district court likewise determined that the subclaim was "purely speculative," *Coleman*, 2013 WL 3367092, at *6, because Coleman "fails to offer any support as to what this expert may have testified to," *Coleman*, 2012 WL 6002469, at *59.

In this appeal, Coleman significantly expands the cultural-expert subclaim. Coleman argues that a cultural expert could have explained that a hatred of "snitching" is "seared in the culture" of drug-trafficking communities and that young African-American males living in such communities are pressured to "facilitate [the community's] secrecy, and, especially, *not snitch*." Pet'r's Br. at 54–56. Rather than relying on his mother's and father's affidavits, Coleman's appellate brief cites to various scholarly articles for support. *See id.* at 56–57. We decline to consider the merits of Coleman's expanded argument because it was not raised in Coleman's federal habeas petition and was not included in the COA. *See Coley v. Bagley*, 706 F.3d 741, 755 (6th Cir. 2013). We agree with the district court's conclusion that Coleman's cultural-expert subclaim is speculative and cannot show prejudice.

*Evidence from psychological experts:* Coleman argues that his counsel was ineffective because he failed to present expert psychological testimony. Trial counsel retained a clinical psychologist—Dr. Erhard O. Eimer—to evaluate Coleman but did not present his testimony. *See Coleman*, 2002 WL 31242241, at *8–9. In his postconviction proceedings, Coleman presented Dr. Eimer's affidavit, which gives the findings Dr. Eimer made at the time of Coleman's trial. Dr. Eimer found that Coleman "tends to be rigid and moralistic" and that "[w]hen he feels threatened, he may react with self-righteous indignation and complain that he has been wronged. He typically does not assume responsibility for his problems, and he tends to blame others or to rationalize his faults." R. 231-10, PageID: 5044. Dr. Eimer diagnosed Coleman with Compulsive Personality Disorder but noted that "[t]he diagnostic indicators emerging from Mr.

Coleman's tests counterindicate any other personality disorder, particularly those associated with a tendency to engage in violent crimes." *Id.* at 5047. Dr. Eimer concluded that Coleman's "exceptionally clear profile definition obtained on his personality inventories . . . allows the very definitive conclusion that Mr. Coleman does not have a propensity toward violent crime, and that he is not a person who would have committed such a crime." *Id.*[8]

The Ohio appellate court found that it was reasonable for counsel not to put Dr. Eimer on the stand because "his opinion was not admissible"[9] and, further, his testimony "would have alienated the jury given the doctor's opinion that Coleman's personality was inconsistent with violent conduct." *Coleman*, 2002 WL 31242241, at *9. The state court also explained that because of "Dr. Eimer's views that Coleman typically blames others for his conduct it is doubtful Dr. Eimer's testimony would have been helpful." *Id.*

The district court focused on the aspects of Dr. Eimer's report that would have been "detrimental to the defense," pointing to the same language that the state court relied on: "[W]hen . . . [Coleman] feels threatened, he may react with self-righteous indignation and complain that he has been wronged. He typically does not assume responsibility for his problems and tends to blame others or to rationalize his faults." *Coleman*, 2012 WL 6002469, at *59 (third alteration in original).[10] The district court explained that "[t]his line falls squarely into the [s]tate's theory of motive, that Coleman murdered Stevens in an attempt to prevent her from testifying at his drug trafficking trial, as she 'snitched' on him, and he could not do that much

---

[8]Coleman also included an affidavit from licensed psychologist, Dr. Franklin D. Hurt. Dr. Hurt examined Coleman in October 1997 and reached a similar, albeit less definite, conclusion: "While it is certainly impossible to predict what a human being is capable of doing in the past or in the future it would seem very unlikely an individual with Mr. Coleman's personal history, and psychological 'make-up' would be able to kill somebody in an 'execution style' slaying." R. 231-10, PageID: 5062.

[9]Under Ohio case law, an expert witness's opinion regarding the "credibility and veracity of witnesses" is inadmissible. *See State v. Moreland*, 552 N.E.2d 894, 899 (Ohio 1990); *State v. Boston*, 545 N.E.2d 1220, 1240 (Ohio 1989), *overruled on other grounds by State v. Dever*, 596 N.E.2d 436 (Ohio 1992). Therefore, Dr. Eimer's opinion that "[Coleman] is not a person who would have committed [a violent] crime," R. 231-10, PageID: 5047, was most likely inadmissible as an improper expert opinion.

[10]The district court pointed to other negative aspects of the report, which indicated that Coleman was psychologically maladjusted; "overly sensitive to criticism"; "highly suspicious of other people"; "constantly on guard to prevent being taken advantage of"; and "argumentative." *Coleman*, 2012 WL 6002469, at *59.

time." *Id.* The district court therefore concluded that the state court's finding of no prejudice was entitled to deference. *See id.*

Coleman's briefing before the district court emphasized Dr. Eimer's conclusion that Coleman "lacked the psychological propensity to commit the charged capital crime." R. 9, PageID: 23; R. 170, PageID: 1970–71, 1982. On appeal, Coleman highlights the portion of Dr. Eimer's report that explained that Coleman was plagued "by an anxious conformity to the expectations of others" and that he defended against "feelings of personal inadequacy and insecurity" with "excessive conformity." Pet'r's Br. at 58. Coleman then points to Ohio Rev. Code § 2929.04(B)(2), which provides that juries should consider as a mitigating factor "[w]hether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation[.]" Coleman argues that Dr. Eimer's excessive-conformity testimony supports the claim that Coleman was under "duress" or "strong provocation," *see* Ohio Rev. Code § 2929.04(B)(2), because of the hatred of "snitching" within his drug-trafficking community. Pet'r's Br. at 54–56. In other words, Coleman argues that the jury could have "compassionately view[ed]" him as a "characteristically non-violent person" who "excessively conform[ed]" to cultural pressure to loathe snitches and that he was strongly provoked by "the victim's own audacious behavior in secretly betraying [Coleman]." Pet'r's Br. 58–59.

Although Coleman's trial counsel relied on § 2929.04(B)(2)'s mitigating factor during his closing argument, Coleman did not present his snitching-as-provocation argument to the district court. As we have explained, Coleman "may not argue here what he did not argue there." *See Coley*, 706 F.3d at 755. Further, we agree with the district court's conclusion that Coleman failed to show prejudice from the exclusion of Dr. Eimer's testimony at Coleman's trial.

*Closing argument*: In his final subclaim, Coleman argues that his trial counsel was ineffective in failing to present a cogent and appropriate closing argument at the sentencing phase. The Ohio appellate court found that even if it were true that Coleman's counsel failed to present an adequate closing argument, it "did not suggest a probability that the outcome of Coleman's trial would be different had counsel acted as Coleman claimed they should have." *Coleman*, 2002 WL 31242241, at *11.

In his federal habeas petition, Coleman argues that the closing argument was deficient because counsel "utterly failed to present any mitigating evidence." R. 170, PageID: 1973. However, Coleman failed to give specifics as to what arguments his trial counsel should have made. On appeal, Coleman suggests several arguments, but they were not presented to the district court and we decline to consider them here. *See Coley*, 706 F.3d at 755. We also note the district court's finding that counsel asked the jury to consider Coleman's state of mind and to consider mercy in the sentencing decision. *Coleman*, 2012 WL 6002469, at *62. Accordingly, we find this subclaim meritless.[11]

The state court evaluated the totality of the mitigation evidence and reweighed it against the evidence in aggravation to reasonably conclude that Coleman experienced no prejudice from his counsel's conduct. This claim is therefore barred from federal review.

### III.

For the forgoing reasons, we **AFFIRM** the judgment of the district court.

---

[11] Coleman rightly points out that the prejudicial impact of counsel's alleged errors must be reviewed in the aggregate. *See Williams v. Taylor*, 529 U.S. 362, 397–98 (20000. However, the proposed mitigating evidence that Coleman has both preserved and shown to have been available for presentation in state court—his sister's and his children's mother's testimony; evidence of his good behavior while incarcerated for six days; and employment records containing mediocre reviews, absenteeism, and tardiness—convince us that there is a reasonable argument that counsel satisfied *Strickland*'s deferential standard.