RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0007p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

CHARLES GATSON,

        *Defendant-Appellant.*

No. 14-3227

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:13-cr-00313-1—Christopher A. Boyko, District Judge.

Argued: December 4, 2014

Decided and Filed: January 15, 2015

Before: BATCHELDER and KETHLEDGE, Circuit Judges; COLLIER, District Judge.[1]

---

## COUNSEL

**ARGUED:** Matthew J. Cronin, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Paul F. Adamson, BURDON & MERLITTI, Akron, Ohio, for Appellant. Laura McMullen Ford, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

---

## OPINION

---

KETHLEDGE, Circuit Judge. A police officer found a pistol in Charles Gatson's car, which eventually led to his conviction for being both a felon in possession of a firearm and a

---

[1]The Honorable Curtis L. Collier, United States District Judge for the Eastern District of Tennessee, sitting by designation.

misdemeanant with a domestic-violence conviction in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) and (9), respectively.  The district court sentenced Gatson to 180 months' imprisonment.  Gatson now challenges the denial of his motion to suppress evidence of the pistol and his sentence, arguing as to the latter that the district court improperly designated him a career offender.  We affirm.

I.

The district court accepted the following facts as true.  On June 5, 2014, East Cleveland police officers Herbert Hupe and Shannon Cushman heard from dispatch that a school-bus driver named Byrd had reported that a man was approaching young girls.  Byrd described the man as a black male with medium-toned skin and short hair, and said that he drove a black GMC SUV. Byrd also said the man was on Euclid Avenue—an east-west street on which the school-bus depot is located—and specifically that he was between Rally's, a fast-food restaurant one block west of the depot, and Eastham Avenue, which is a north-south cross-street just east of the depot.

Hupe and Cushman arrived within a minute, traveling east on Euclid.  They drove past Rally's, where the parking lot was empty, and then past the bus depot, where a few adults stood outside.  Moments later the officers turned into a parking lot for Walgreen's, which is located on Euclid about a block east of the bus depot.  There they saw a dark grey GMC SUV with a black male with short hair and medium-brown skin sitting in the driver's seat.  Rather than approach him, the officers drove back to the bus depot, where Cushman talked with Byrd while Hupe waited in the car.  At that point, another police officer, Brandon Tisdale, drove up.  Cushman told Hupe and Tisdale that their suspect was in the Walgreen's parking lot.

Hupe was back at Walgreens less than a minute later, followed by Tisdale in his cruiser. Their suspect—later identified as Gatson—still sat in his SUV.  Hupe walked up to an open window on the passenger's side of the SUV and asked Gatson why he was at Walgreen's. Gatson said he was waiting for a friend.  Then Tisdale walked up to the open driver's side window and likewise asked Gatson why he was there.  Gatson said that he had just taken his kids to school.  The officers noticed that Gatson's speech was slurred and his movements sluggish. They asked if he had been drinking.  Gatson said yes.  They asked if he had been talking to young girls.  Gatson said yes.

Tisdale asked Gatson for some ID. As Gatson tried to find it, the officers saw him use both hands to push something between the driver's seat and center console. Tisdale asked Gatson to step out of the vehicle, which he did. Hupe handcuffed Gatson, then frisked him—finding his driver's license in his front pocket—and locked him in the police cruiser. Then Tisdale entered Gatson's license number into his cruiser's computer while Hupe walked around to the driver's side of the SUV. He saw a pistol handle protruding from the space between the driver's seat and center console, where Gatson had been pushing something with his hands. Hupe retrieved the pistol and gave it to Tisdale.

A grand jury later indicted Gatson for being a felon in possession of a firearm and a misdemeanant with a domestic-violence conviction in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) and (9). Gatson moved to suppress evidence of the pistol. The district court held an evidentiary hearing, at which Hupe, Tisdale, and Gatson testified. The court accepted the testimony of Hupe and Tisdale as true, and denied the motion. Gatson then pled guilty, but reserved his right to appeal the denial of his suppression motion.

At sentencing, the court determined that Gatson was subject to a 15-year mandatory minimum under the Armed Career Criminal Act, 18 U.S.C. § 924(e), because of his prior convictions for arson and domestic violence. This determination increased the lower end of Gatson's Guidelines range from 168 to 180 months; his upper end remained 210 months. The court sentenced Gatson to 180 months' imprisonment.

This appeal followed.

II.

A.

Gatson argues that the stop during which the police found the pistol was illegal. We review the legality of an investigatory stop de novo, viewing the evidence in the light most favorable to the district court's decision. *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008).

If a police officer has reasonable suspicion that a person is engaged in criminal activity, the officer may briefly detain the person to investigate. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Reasonable suspicion must be based on specific, articulable facts. *Campbell*, 549 F.3d at 371.

"Reasonable suspicion need not arise from an officer's direct observation, but can be based on informant tips and dispatcher information." *Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006). Specifically, a tip from an identifiable informant who gives reasonably detailed information can provide reasonable suspicion, especially if an investigating officer's own observations contribute to his suspicions. *Id.* at 779-80. Here, Gatson argues that Byrd was more like an anonymous informant, because the officers who detained him did not talk to her directly. But the law did not require them to. *See id.* at 779. And Byrd was not anonymous: Hupe and Tisdale undisputedly knew her name and that she drove a school bus, which in turn enhanced the credibility of her report that she had seen a man soliciting schoolgirls. The officers also spotted a dark-colored GMC SUV less than a block from where Byrd had seen such a vehicle—and inside sat a man matching the description she had provided. These facts were enough to give the officers reasonable suspicion that Gatson had been engaged in criminal activity.

Gatson next argues that the officers exceeded the bounds of an investigatory stop when they removed him from his vehicle and then searched it. The question here depends on whether the officers had reason to suspect that Gatson was armed and dangerous; if so, the officers were entitled—among other measures for their own safety—to remove him from the vehicle, handcuff him, frisk him for weapons, and conduct a protective search of the vehicle itself to ensure that Gatson could not retrieve a weapon upon reentering it. *Arizona v. Johnson*, 555 U.S. 323, 330-32 (2009); *United States v. Graham*, 483 F.3d 431, 440 (6th Cir. 2007). Gatson disputes none of these points, or even that the district court's findings supported its determination that the officers had reason to think Gatson was armed and dangerous. Instead, he contends that the court should have found that his testimony at the evidentiary hearing was more credible than the officers' was.

We review a district court's credibility determination for clear error, but give the court an extra measure of deference. *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010). That is not to say those determinations are beyond review; but to overcome them, a party must

contradict them with objective evidence or show that a witness's story is "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it[.]" *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985).

Gatson contends that standard is met here because the officers included in their testimony at least two details they had omitted from some earlier statements regarding their encounter with Gatson. First, Gatson asserts that neither officer mentioned, during interviews with an ATF agent after Gatson's arrest, that Gatson's pistol had been in plain view next to the GMC's center console. But the record does not support that assertion as to Hupe: the ATF agent testified only that Tisdale had not mentioned that the pistol was in plain view; the agent said nothing about whether the same was true of Hupe. And Tisdale's omission is not especially significant given that he was not the officer who had spotted the gun. Second, Gatson points out, correctly, that neither officer mentioned in his police report of the incident that Gatson told them he had been talking to young girls. But that point is collateral both to the question whether Gatson was armed and dangerous and to the reports' focus by then—which was Gatson's unlawful possession of the gun. So that omission does not upend the court's credibility determination either.

Gatson also contends the officers contradicted each other at the hearing. But again that stretches the record farther than we can on appeal. Each officer testified that he asked Gatson what he was doing in the parking lot at Walgreen's. According to Hupe, Gatson told him that he was waiting for a male friend; according to Tisdale, Gatson told him that he had just dropped his kids off at school. That testimony is not necessarily contradictory, in part because Gatson responded separately to each of them; and to the extent there is any contradiction, it impeaches Gatson as much as it does the officers.

Finally, Gatson argues that his pistol could not have been in plain view because the officers did not see it when they removed him from the SUV. But the officers plausibly explained that they were focused on Gatson himself while they removed him from the SUV, and that Gatson's body—he weighs about 240 pounds—might have obstructed their view of the gun, whose handle alone protruded from the seat cushion. The district court did not clearly err when it credited the officers' testimony.

B.

Gatson challenges the district court's conclusion that Gatson was a career offender under 18 U.S.C. § 924(e). That section requires a minimum sentence of 15 years' imprisonment for a defendant who is convicted of a firearms crime listed in 18 U.S.C. § 922(g) and who has been convicted of three or more violent felonies. 18 U.S.C. § 924(e)(1). Here, the district court determined that Gatson had three convictions for Ohio state-law crimes that are violent felonies for purposes of § 924(e): one for arson, and two for domestic violence. We review that determination de novo. *United States v. Mitchell*, 743 F.3d 1054, 1058 (6th Cir. 2014).

A violent felony is a felony that either "has as an element the use, attempted use, or threatened use of physical force against another" or "is burglary, arson, or extortion, involves the use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another[.]" § 924(e)(2)(B). To determine if a felony fits either category, we first look to the statutory definition of the offense. *Mitchell*, 743 F.3d at 1058. If the elements of the offense show that it is always a violent felony, then we look no further. *Id.* If the offense contains alternative elements that would render the felony nonviolent, however, then we review the indictment or jury instructions to determine which of the alternative elements were met in the defendant's case. *Descamps v. United States*, 133 S. Ct. 2276, 2283-84 (2013).

Section 924(e) specifically lists arson as a violent felony. But not every felony that a state labels an arson fits § 924(e)'s definition of arson. *See Taylor v. United States*, 495 U.S. 575, 590-92 (1990). Instead, we ask whether Gatson's offense comports with the "generic, contemporary meaning" of arson. *See id.* at 598.

When Gatson committed arson in Ohio, he "knowingly caused or created a substantial risk of physical harm to property without the victim's consent" by "means of fire or explosion[.]" Ohio Rev. Code § 2909.03(A)(1). (His arson was a felony instead of a misdemeanor, the indictment tells us, because he damaged property—a car—worth $500 or more.) Gatson contends this crime is not arson in the generic sense because the crime does not include, as an element, a risk of harm to people. But even a fire whose purpose is to destroy personal property—say, a car—might well harm an occupant, bystander, or firefighter. And more to the point, a risk of harm to people is not an element of generic arson; most states (and federal law)

"make arson of personal property a crime" regardless. *United States v. Misleveck*, 735 F.3d 983, 986 (7th Cir. 2013). Thus, like every other court to consider the question, we conclude that generic arson embraces "the intentional or malicious burning of any property[,]" *id.* at 988—which is what Gatson was convicted of doing.

That leaves his domestic-violence convictions. In addition to the listed offenses, § 924(e) covers any crime that "has as an element the use, attempted use, or threatened use of physical force against another[.]" § 924(e)(2)(B)(i). Physical force in this context means "*violent* force—that is, force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010) (emphasis in original).

Gatson's domestic-violence convictions establish that he "knowingly caused, or attempted to cause, physical harm to a family or household member." Ohio Rev. Code § 2919.25(A). (Once again, the indictments tell us these convictions were for felonies instead of misdemeanors, because Gatson had two or more prior domestic-violence convictions.) Here, the key term is "physical harm," which Ohio defines as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." Ohio Rev. Code § 2901.01(A)(3). Force that causes any of those things is (to some extent, by definition) force "capable of causing physical injury or pain to another person." *Johnson*, 559 U.S. at 140. That means Gatson's domestic-violence convictions are violent felonies within the meaning of § 924(e).

But Gatson argues that the Supreme Court's recent decision in *United States v. Castleman*, 134 S. Ct. 1405 (2014), supports the opposite conclusion. In *Castleman*, the Court interpreted the same two words that the Court interpreted in *Johnson*—"physical force"—but did so for purposes of a different provision, namely, 18 U.S.C. § 922(g)(9), which bars possession of a firearm by any person convicted of a "misdemeanor crime of domestic violence." *Id.* "Ultimately, context determines meaning," *Johnson*, 559 U.S. at 139; and in *Castleman* the Court concluded that "physical force" has an even broader meaning in the context of "misdemeanor crime of domestic violence" under § 922(g)(9) than that same term does in the context of "violent felony" under § 924(e). 134 S. Ct. at 1412-13. So the actual holding of *Castleman* does not help Gatson. But he says some dicta does: the Court observed that "domestic violence" is "a term of art encompassing acts that one might not characterize as

'violent' in a nondomestic context." *Id*. at 1411. From that, Gatson infers that *his* domestic-violence convictions were based upon acts that we should not characterize as violent in the context of § 924(e). But the inference does not follow: the Court did not say that *every* act of domestic violence would be considered nonviolent in a nondomestic context; and so far as Gatson's convictions are concerned, we have already demonstrated that they satisfy the definition of "violent felony" under § 924(e). So we reject his argument.

The district court's judgment is affirmed.