NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0616n.06

No. 19-2284

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Oct 30, 2020 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| KENNETH LEON CALHOUN, | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | |

Before: McKEAGUE, THAPAR, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. Law enforcement officers searched Kenneth Calhoun's home pursuant to a probationary search clause. They recovered illegal drugs and other items indicating that Calhoun had violated his probation conditions and federal law. After a federal grand jury indicted him for possession of a controlled substance with intent to distribute, Calhoun moved to suppress this evidence, arguing that officers lacked the reasonable suspicion required for a warrantless probationary search. The district court denied the motion. Calhoun then entered a conditional guilty plea, reserving his right to appeal the denial of the suppression motion. This appeal followed. For the reasons below, we AFFIRM the district court's denial of Calhoun's motion to suppress.

I.

On August 2, 2018, Probation Officer Elizabeth Loney and police officers from the Kalamazoo Valley Enforcement Team (KVET) searched Kenneth Calhoun's home on Wallace

Avenue in Kalamazoo, Michigan. During the search, they recovered crystal methamphetamine, marijuana, seven bottles of codeine syrup, a gun magazine with .22 caliber ammunition, and other "drug-related" items.

At the time, Calhoun was on probation following a Michigan conviction for "delivery/manufacture of marijuana." Calhoun had signed a probation order requiring him to submit to a warrantless search if probation officers had "reasonable cause" to suspect that he was in possession of prohibited items, such as weapons or controlled substances.

About a week prior to the search, a known confidential informant met with Investigator Benjamin Ulman. The informant told Ulman that someone had stolen $20,000 from Calhoun's home on Wallace Avenue and that Calhoun had paid his brother, James Douglas White, to retaliate by "shoot[ing] up" a house on Kalamazoo's east side. Ulman knew that officers had responded to that shooting just days earlier.

Ulman relayed the informant's report at the next weekly Kalamazoo-area "crime reduction meeting"—a weekly gathering of law enforcement agencies to share information about ongoing criminal investigations. Sergeant Michael Ferguson and Probation Officer Loney were among those who attended the meeting, held on August 1, 2018. Calhoun's usual probation officer, Anthony Tyus, was on vacation that week and did not participate in the meeting or the search of Calhoun's home.

What Loney learned at the crime reduction meeting prompted her to run Calhoun's name through her computer system; there, she discovered that he was subject to a probationary search clause. She also noted that the home address Calhoun had last reported to Tyus matched the Wallace Avenue address the informant had relayed to Ulman. Calhoun's probation conditions required him to obtain written permission from his probation officer before changing his residence.

Loney and Ferguson decided to conduct a probation compliance check at Calhoun's home. Believing that Calhoun might have weapons in the house, they planned the check for the next day, August 2, so that they would have time to secure the assistance of other officers. In preparation, Ferguson drove past the Wallace Avenue residence twice on August 1. The first time, he saw a black Mercedes parked in front of the house, and on his second pass, he saw Calhoun driving the Mercedes at a nearby intersection on Wallace Avenue.

On August 2, Loney arrived at Calhoun's home with an intern and several police officers, including Ferguson. When they approached, they saw Calhoun standing in a group on the sidewalk, apparently filming a rap video. Sergeant Brian Cake, Ferguson, and other officers approached Calhoun, identified themselves, and said that a probation officer wanted to do a walkthrough of the house. Calhoun responded that he did not live in the house and that he was staying with his sister. Cake testified that Calhoun's demeanor became "more defensive" and that he made "a lot of strange movements" after they approached. Calhoun told the officers that no one was in the house, that he did not have a key, and that he would need to call his girlfriend to open the door for him. He held his phone to his ear and appeared to be calling someone.

After getting permission from Loney, Ferguson took the keys from the black Mercedes, which was parked in the street in front of the house with its engine running and windows down. Ferguson had noticed a key attached to the key fob in the car and thought it was likely a key to the house. He proceeded to the porch with the keys but found the front door unlocked, contrary to Calhoun's claims. And a key attached to the Mercedes key fob proved a fit for the front door lock.

At Ferguson's prompting, Calhoun walked to the porch to speak with Ferguson, Loney, and other officers. Before Calhoun reached the porch, Investigator John Khillah knocked, opened the front door, and saw Calhoun's girlfriend inside with a child.

On the porch, Calhoun again denied that he lived in or had access to the house, although he said he did keep some shoes and clothes there. Loney texted Tyus to confirm that Calhoun had not registered a different address; Tyus responded, confirming Calhoun's residence on Wallace Avenue.

Shortly after the exchange on the porch, officers searched the house. Calhoun's brother, White, arrived during the search, asked to see his brother, and asked why the police were at his brother's house. Cake notified White of the probation compliance check. The search revealed controlled substances, ammunition, and other drug-related items. Officers arrested Calhoun with Loney's authorization.

A federal grand jury indicted Calhoun on one count of possession of a controlled substance with intent to distribute in violation of 18 U.S.C. § 841(a)(1), (b)(1)(A)(viii), and (b)(1)(D). Calhoun moved to suppress the evidence seized during the search of his house. The district court denied Calhoun's motion after an evidentiary hearing. Calhoun then entered a conditional guilty plea, preserving his right to appeal the denial of the suppression motion. The district court sentenced Calhoun to 180 months' imprisonment to be followed by 5 years' supervised release.

## II.

"On appeal from the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo." *United States v. Sweeney*, 891 F.3d 232, 235 (6th Cir. 2018) (citing *United States v. Foster*, 376 F.3d 577, 583 (6th Cir. 2004)). We review all evidence "in the light most favorable to the government." *United States v. Ickes*, 922 F.3d 708, 710 (6th Cir. 2019) (citing *United States v. Gunter*, 551 F.3d 472, 479 (6th Cir. 2009)).

A.

As a preliminary matter, the government argues that Calhoun lacks standing to challenge the search of his home because he told officers that he did not live there. In the Fourth Amendment context, "standing" is "a useful shorthand" for the requirement "that a person must have a cognizable Fourth Amendment interest in the place searched" in order to challenge a search as unconstitutional. *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018). Unlike the Article III doctrine that shares its name, Fourth Amendment "standing" is not jurisdictional and "need not be addressed before . . . other aspects of the merits of a Fourth Amendment claim." *Id.*

The district court did not consider Calhoun's standing, concluding that the search was constitutional in any event. We agree, and so we do not decide whether Calhoun retained a privacy interest in his home despite his false statements to officers.

B.

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. The general rule that law enforcement may not conduct a search without a warrant supported by probable cause does not apply to probationers subject to a search condition. *United States v. Knights*, 534 U.S. 112, 121 (2001). Instead, a search is reasonable when law enforcement has "reasonable suspicion" that the probationer has engaged in illegal conduct. *Ickes*, 922 F.3d at 711 (citing *Knights*, 534 U.S. at 121).

The reasonable suspicion standard "requires . . . 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). A mere "inarticulate hunch[]," however, will not suffice. *Terry v. Ohio*, 392 U.S. 1, 22 (1968). Based on the "totality of the circumstances of each case" officers

must have "a particularized and objective basis for suspecting legal wrongdoing." *United States v. Herndon*, 501 F.3d 683, 691 (6th Cir. 2007) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information" that gives rise to reasonable suspicion. *Arvizu*, 534 U.S. at 273.

We begin with the in-person tip Investigator Ulman received from KVET's known confidential informant.[1] Ulman and Ferguson both testified that the department would have determined that the tipster here was "reliable and credible" before making him or her a confidential informant. Evidence that an informant was known to law enforcement and had previously provided reliable information can support the informant's credibility. *See Adams v. Williams*, 407 U.S. 143, 146–47 (1972); *United States v. Martin*, 526 F.3d 926, 937 (6th Cir. 2008) (collecting cases). And while the exact source of the informant's knowledge here is unclear, the detailed content of the informant's report suggests a reliable basis of knowledge. *See United States v. Gatson*, 776 F.3d 405, 408 (6th Cir. 2015) ("[A] tip from an identifiable informant who gives reasonably detailed information can provide reasonable suspicion . . . ."). The informant identified Calhoun and his brother, James Douglas White, by name. The informant provided Calhoun's address, which matched the address that Calhoun had on file with the probation office and where Calhoun now concedes he was living at the time. The informant also gave detailed information

---

[1] Ulman learned that the tipster was a known confidential informant of KVET shortly after speaking with him or her. Calhoun makes much of Ulman's statement at the evidentiary hearing that he did not believe that he had enough evidence to seek a warrant to search Calhoun's home immediately after speaking to the informant. But this statement reflects Ulman's assessment before he learned that the tip came from a known confidential KVET informant. And of course, the reasonable suspicion necessary for a probationary search requires a lower level of evidence than the probable cause needed to secure a search warrant. Therefore, Ulman's statement does not help Calhoun.

about suspected criminal activity: someone had robbed Calhoun of $20,000, and Calhoun, in retaliation, allegedly paid his brother to shoot up a house on the east side of Kalamazoo. *See United States v. Hensley*, 469 U.S. 221, 234 (1985) (noting "the wealth of detail concerning the robbery revealed by the informant" as one factor supporting reasonable suspicion that justified an investigatory stop). Law enforcement also independently corroborated that the shooting had occurred. "[S]ome independent corroboration by the police of the informant's" report can support reasonable suspicion of illegal activity. *Bazzi v. City of Dearborn*, 658 F.3d 598, 605 (6th Cir. 2011) (quoting *United States v. Tuttle*, 200 F.3d 892, 894 (6th Cir. 2000)); *see also Illinois v. Gates*, 462 U.S. 213, 241–42 (1983).

At the evidentiary hearing, Sergeant Ferguson testified that, based on his training and experience, similar episodes of robbery and retaliation are "quite common" in the illegal drug trade. As he explained, drug dealers tend to have large amounts of cash on-hand and are less likely to report robberies to law enforcement, making them "easy target[s]" for theft. After the crime reduction meeting, Probation Officer Loney looked up Calhoun in the relevant computer database. Calhoun was on probation following a 2017 conviction for the delivery or manufacture of marijuana. Officers are entitled to rely on "specific, articulable facts" and "reasonable inferences . . . based on [their] experience" to support reasonable suspicion. *United States v. McCauley*, 548 F.3d 440, 445 (6th Cir. 2008); *see also Martin*, 526 F.3d at 937 (considering defendant's criminal history in conjunction with confidential informant's tip to find probable cause to support a search warrant). Based on the information available to them after the crime reduction meeting, Loney and Ferguson suspected that Calhoun could have been involved in the shooting and that he could be in possession of drugs and weapons in violation of his probation conditions.

Calhoun bolstered the officers' suspicions when he greeted them with a series of lies at the outset of the compliance check. This court has recognized that false statements to law enforcement can support reasonable suspicion. *See, e.g.*, *United States v. Atchley*, 474 F.3d 840, 848–49 (6th Cir. 2007); *Weaver v. Shadoan*, 340 F.3d 398, 408 (6th Cir. 2003). Calhoun claimed that he did not live in the house, that he would need to call his girlfriend to gain entry, and that no one was inside. At least with respect to Calhoun's claim to live elsewhere, Loney knew that this information conflicted with what Calhoun had told Probation Officer Tyus.

A subject's "evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Sergeant Cake testified that Calhoun's "physical demeanor change[d]" once officers approached him on the sidewalk and that Calhoun engaged in "a lot of strange movements and actions." Calhoun put his phone to his ear while Cake was questioning him. Cake testified that, in his experience, similar attempts "to tune the officer out . . . mean[] that [a subject] [is] trying to avoid" the questioning. More than one officer testified that it appeared as if Calhoun might be taking the opportunity to call someone in the house to destroy or hide evidence. The district court found that "Calhoun essentially telegraphed to the officers through his words, actions, and demeanor that there was something in the house he did not want them to see." We cannot say that this finding was clearly erroneous.

As of this initial sidewalk encounter with Calhoun—if not earlier—law enforcement had reasonable suspicion of criminal wrongdoing and probation violations. Under the totality of the circumstances, the tip from a reliable informant who demonstrated detailed knowledge about Calhoun's potential involvement in a shooting, independent police verification that the shooting had occurred, Calhoun's prior record of drug offenses, the tip's consistency with officers' experience regarding individuals involved in the illegal drug trade, and Calhoun's false statements

and evasive demeanor were enough to support reasonable suspicion. Therefore, the subsequent search of Calhoun's home was constitutional. *See Knights*, 534 U.S. at 121.

Calhoun raises several arguments against the reasonableness of the search, but all are unavailing. First, he characterizes the tip from the informant as having gone "stale" by the time of the search. Calhoun does nothing to develop this argument, and therefore, it is forfeited. *Coleman v. Bradshaw*, 974 F.3d 710, 721 n.6 (6th Cir. 2020). And, in any event, we find nothing to suggest that the tip had lost its reliability during the course of the week. *See Tuttle*, 200 F.3d at 894 (concluding that tip was not stale when only a week passed between an informant's report of ongoing criminal activity and the issuance of a search warrant).

Calhoun next suggests that because Loney was unfamiliar with him before the crime reduction meeting and because his usual probation officer was on leave, it was unreasonable for anyone to suspect that he had violated the terms of his probation. This argument has no merit. Neither first-hand knowledge of criminal activity nor personal familiarity with a suspect are prerequisites to reasonable suspicion. *See Hensley*, 469 U.S. at 231–33; *Gatson*, 776 F.3d at 408.

Lastly, Calhoun argues that the search was unreasonable because law enforcement "use[d] . . . a probation agent as a front or 'stalking horse'" to investigate alleged criminal activity without the need for a search warrant. Precedent forecloses this argument. Before the Supreme Court's decision in *Knights*, some courts held that a "warrantless search of a probationer" was unconstitutional unless it was "a 'special needs' search conducted by a probation officer" to monitor "compl[iance] with probation restrictions." *Knights*, 534 U.S. at 117 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 876 (1987)). But *Knights* rejected this argument. *Id.* at 117–18. And so have we. "[T]he 'stalking horse' caveat, if it survives *Knights* at all, does not apply when a probationer is subject to a valid search provision and law-enforcement officers have a reasonable

suspicion that the probationer is engaging in illegal activity." *Ickes*, 922 F.3d at 712. Calhoun was subject to a probationary search clause, and officers had reasonable suspicion that he was engaged in illegal activity. Therefore, Calhoun's "stalking horse" argument fails.

\* \* \*

We AFFIRM the district court's denial of Calhoun's motion to suppress.